IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD PIAZZA, | : | CIVIL ACTION NO. **3:CV-09-1087** |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| CT CORPORATION, t/d/b/a Mohegan | : | |
| Sun at Pocono Downs and | : | |
| PENNSYLVANIA STATE POLICE | : | |
| TROOPER CURT A. SZCZECINSKI, | : | |
| | : | |
| Defendants | : | |

**REPORT AND RECOMMENDATION**

**I. Background.**

On June 8, 2009, Plaintiff, Richard Piazza filed, through counsel, a civil rights Complaint pursuant to 42 U.S.C. § 1983. (Doc. 1). Plaintiff also asserted state law tort claims. Plaintiff originally named as Defendants CT Corporation, t/d/b/a Mohegan Sun at Pocono Downs, and the Pennsylvania State Police, Division of Gaming Enforcement ("PSP"). Defendant PSP filed a Motion to Dismiss Plaintiff's original Complaint on July 30, 2009. (Doc. 5). Defendant CT Corporation filed a Motion to Dismiss Plaintiff's original Complaint on August 18, 2009. (Doc. 11). Plaintiff then filed an Amended Complaint on August 31, 2009. (Doc. 8). As Defendants in his amended pleading, Plaintiff named CT Corporation, t/d/b/a Mohegan Sun at Pocono Downs, PSP, PSP Trooper Curt A. Szczecinski, and Trooper John Does, Numbers One and Two. The three individual Trooper Defendants were all alleged to have been assigned to the PSP Division of Gaming Enforcement. Plaintiff sued Defendants Trooper Szczecinski and Trooper John Does, Numbers One and Two, in both their official and individual capacities. (*Id.*, pp. 2-3).

In response to Plaintiff's Amended Complaint, Defendant CT Corporation filed an Answer with Affirmative Defenses on September 22, 2009.  (Doc 10).   Defendants PSP, Szczecinski, and Trooper John Does Numbers One and Two ("Commonwealth Defendants"), jointly filed a Motion to Dismiss Plaintiff's Amended Complaint on September 24, 2009, pursuant to Fed. R. Civ. P. 12(b)(1), (4), (5) and (6).  (Doc. 11).  A support Brief was filed by Commonwealth Defendants on the same date. (Doc. 12).  Plaintiff filed his Brief in opposition to Commonwealth Defendants' Motion to Dismiss on October 9, 2009.  (Doc. 13).  Commonwealth Defendants filed their Reply Brief on October 19, 2009.  (Doc. 14).

On February 3, 2010, we issued a Report and Recommendation ("R&R")  and recommended that Commonwealth Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Doc. 11) be granted at to all claims against them except for Plaintiff's Fourth Amendment illegal search and seizure claim (Count One) and his   § 1983 malicious prosecution claim (Count Three) against Defendant Trooper Szczecinski in his individual capacity.  We also recommended that this case be remanded to the undersigned for further proceedings with respect to Defendant CT Corporation, t/d/b/a Mohegan Sun, and Defendant Trooper Szczecinski.    (Doc. 15).

On February 26, 2010, the Court issued an Order and adopted our R&R.  (Doc. 16).

After remand, we then  directed Defendant Trooper Szczecinski to file his Answer to Plaintiff's Amended Complaint. (Doc. 17).  On March 9, 2010,  Defendant Trooper Szczecinski filed his Answer to Plaintiff's Amended Complaint.  (Doc. 19).

We then held a joint case management conference with Plaintiff and the two remaining Defendants,  Trooper Szczecinski and CT Corporation.  (Doc. 22).

Following the close of discovery, on November 22, 2010, Defendant Trooper Szczecinski filed a Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56.  **(Doc. 32).**[1]   Defendant Trooper Szczecinski also  filed his Statement of Material Facts ("SMF") with exhibits, his support brief and a DVD from Mohegan Sun's surveillance system.  (Docs. 33, 34 & 35).  On December 13, 2010, Plaintiff filed his opposition brief to Defendant Trooper Szczecinski's Motion for Summary Judgment and his answer to Defendant Trooper Szczecinski's SMF.  (Docs. 38 & 39).  On December 29, 2010,  Defendant Trooper Szczecinski filed his reply brief.  (Doc. 49).

On December 15, 2010, Plaintiff filed his own Motion for Partial Summary Judgment. **(Doc. 40).**  Plaintiff seeks judgment as a matter of law with respect to his remaining claim against Defendant Trooper Szczecinski (i.e. his Fourth Amendment illegal search and seizure claim) and his negligence claim against Defendant CT Corporation.  Plaintiff also filed his wife's (Marianne Piazza) Affidavit and his Affidavit.  (Docs. 41 & 42).  Further, Plaintiff filed his support brief and his SMF.  (Docs. 43 & 44).  Additionally, Plaintiff filed exhibits.  (Doc. 46).  On January 6, 2011, Defendant Trooper Szczecinski filed his answer to Plaintiff 's SMF with attached exhibits and his opposition brief to Plaintiff 's Summary Judgment Motion.  (Docs. 54 & 55).   On January 10, 2011, Defendant CT Corporation filed its opposition brief to Plaintiff 's Motion for Summary and its response to Plaintiff 's SMF with an attached exhibit.  (Docs. 58 & 59).  On January 21, 2011, Plaintiff filed his reply brief.  (Doc. 65).

---

1.   Defendant CT Corporation concurred in Defendant Trooper Szczecinski's Summary Judgment Motion.  (Doc. 32, p. 3).

Also, on December 15, 2010, Defendant CT Corporation filed its Motion for Summary Judgment. **(Doc. 45).**[2] Defendant CT Corporation simultaneously filed its support brief and SMF with attached exhibits. (Docs. 47 & 48).   Plaintiff filed his brief in opposition to Defendant CT Corporation 's Summary Judgment Motion on January 5, 2011. (Doc. 50).   On January 19, 2011, Defendant CT Corporation filed its reply brief in support of its summary Judgment Motion.  (Doc. 63).

All three  Motions for Summary Judgment of the parties are ripe for disposition. **(Docs. 32, 40 & 45).**[3]

The parties filed several other motions related to the pending dispositive motions, namely Docs. 52, 56, 60, 62 & 69.

On February 8, 2011, we held oral argument, on the record,   regarding the three Summary Judgment Motions and the related motions.  Prior to oral argument, Plaintiff withdrew his Docs. 62 & 69 Motions. (Doc. 74). At oral argument, we decided one of the remaining related motions.   Specifically, we denied Defendant Trooper Szczecinski 's Doc. 56 Motion as moot since we found that any conspiracy claim Plaintiff raised against Defendant Trooper Szczecinski was dismissed by the Court in its  February 26, 2010 Order and its adoption of our February 3, 2010 R&R.  Thus, of the related motions, only Docs. 52 & 60 remain, namely, Defendant Trooper

---

2.   Defendant Trooper Szczecinski concurred in Defendant CT Corporation's Motion for Summary.  (Doc. 45, p. 4).

3.   The undersigned has been assigned this case for pre-trial maters pursuant to 28 U.S.C. § 636(b)(i)(A).

Szczecinski's and Defendant CT Corporation's respective Motions to Strike certain paragraphs of Plaintiff 's SMF and certain exhibits submitted by Plaintiff.

In this R&R, we consider the pending motions of Defendant Trooper Szczecinski, i.e. Doc. 32 Summary Judgment Motion and Doc. 52 Motion to Strike, as well as Plaintiff 's Doc. 40 Summary Judgment Motion to the extent it is against Defendant Trooper Szczecinski.  We shall consider  Plaintiff 's Doc. 40 Summary Judgment Motion to the extent it is against Defendant CT Corporation and Defendant CT Corporation's Doc. 45 Summary Judgment Motion and Doc. 60 Motion to Strike in a separate R&R.

## II.  Motion for Summary Judgment Standard.

In *Allen v. Fletcher*, 2009 WL 1542767, *2 (M.D. Pa.), the Court outlined the applicable standard to apply when considering a summary judgment motion as follows:

> Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
>
> Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Id.* An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.*
>
> Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure:

Civil 2D § 2727 (2d ed.1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson,* 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

"Material facts" are those which might affect the outcome of the suit. *Justofin v. Metropolitan Life Ins. Co.*, 372 F.3d 517, 521 (3d Cir. 2004).

## III. Allegations of Amended Complaint.

Plaintiff avers that, while he was playing a slot machine at the Mohegan Sun Casino, he found an envelope containing gaming vouchers on the floor. Plaintiff did not know who dropped the envelope. Plaintiff states that he tried to locate Casino personnel in order to help him find the owner of the envelope, but to no avail. Plaintiff alleges that when he resumed playing a slot machine, he was confronted by former Defendant John Doe Troopers and escorted to the Casino Security Office. Plaintiff avers that he was interrogated by Casino personnel and accused of stealing

the gaming vouchers, and that the John Doe Troopers and Casino personnel held him in their custody for about one and a half hours.

Plaintiff states that a PSP Gaming Officer accused him of stealing the envelope and told him he was being arrested. Plaintiff avers that Defendant Trooper Szczecinski then fingerprinted him and took his mug shot photo. Plaintiff then alleges that Defendant Trooper Szczecinski filed criminal charges against him, and that following a hearing before a District Justice at the Luzerne County Courthouse, all of the charges were dismissed.

Plaintiff asserted claims (Counts One, Two and Three) under 42 U.S.C. § 1983 against all Commonwealth Defendants. In Count One, Plaintiff alleged that his September 22, 2007 seizure and arrest by the Commonwealth Defendants at the Mohegan Sun Casino was without probable cause. Plaintiff alleged that he was arrested and seized in violation of the Fourth Amendment, and that this conduct deprived him of his due process rights under the Fourteenth Amendment. (Doc. 8, pp. 8-9).

In Count Two, Plaintiff raised a § 1983 claim that Commonwealth Defendants conspired with Defendant Mohegan Sun to violate his rights under the Fourth Amendment and Fourteenth Amendment. (*Id.*, pp. 9-10).

In Count Three, Plaintiff raised a § 1983 malicious prosecution claim against Commonwealth Defendants, and he alleged that they initiated criminal proceedings against him without probable cause and with malice or for a purpose other than to bring him to justice. (*Id.*, pp. 10-11). Plaintiff stated that the criminal proceedings terminated in his favor.

In Count Four, Plaintiff raised a state law abuse of process claim against Commonwealth Defendants, and he alleged that these Defendants used the criminal legal process against him in a manner "to accomplish a purpose for which it was not designed."(*Id.*, p. 11).

In Count Five, Plaintiff asserted a state law Intentional Infliction of Emotional Distress ("IIED") claim against Commonwealth Defendants, and he alleges that these Defendants, "by their extreme and outrageous conduct, intentionally or recklessly caused [him] to suffer severe emotional distress." (*Id.*, p. 12).

In Count Six, Plaintiff raised a municipal liability claim under § 1983 against Defendant PSP, and he alleges that "the policies and customs of Defendant Pennsylvania Gaming Enforcement ... were in violation of the Fourth Amendment and Fourteenth Amendment." (*Id.*, pp. 12-13).

In Count Seven, Plaintiff raised a state law false imprisonment claim against all Defendants, and he alleged that Defendants unlawfully detained and restrained him on September 22, 2007, without probable cause, in a small room at Mohegan Sun Casino for about one and a half hours. (*Id.*, pp. 9-10).

In his final count, Count Nine[4], Plaintiff raised a negligence claim against only Defendant CT Corporation, i.e. Mohegan Sun. (*Id.*, pp. 14-15).

As relief, Plaintiff sought compensatory and punitive damages.

Plaintiff correctly recognized (Doc. 8, pp. 3-4) that jurisdiction of this Court is pursuant to 28 U.S.C. § 1331, § 1343(a), and he sought to invoke the Court's supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367.

---

4 .   Plaintiff erroneously skipped Count Eight in his Amended Complaint.

As stated, on February 26, 2010, the Court granted the Commonwealth Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Doc. 11) as to all claims against them except for Plaintiff's Fourth Amendment illegal search and seizure claim (Count One) and  his § 1983 malicious prosecution claim (Count Three) against Defendant Trooper Szczecinski in his individual capacity.   Plaintiff's negligence claim against Defendant CT Corporation, i.e. Mohegan Sun, also remained.

Moreover, during the February 8, 2011 oral argument, Plaintiff withdrew, on the record, his § 1983 malicious prosecution claim (Count Three) against Defendant Trooper Szczecinski. Thus, only Plaintiff's Fourth Amendment illegal search and seizure claim (Count One) against Defendant Trooper Szczecinski remains as well as Plaintiff's negligence claim against Defendant CT Corporation, *i.e.* Mohegan Sun.   Further,  Defendant Trooper Szczecinski's Doc. 52 Motion to Strike certain paragraphs of Plaintiff 's SMF and certain exhibits submitted by Plaintiff is moot insofar as the motion seeks to strike Plaintiff's SMF and exhibits which only pertain to his withdrawn § 1983 malicious prosecution claim (Count Three) against Defendant Trooper Szczecinski.

Accordingly, we will not discuss any SMF and exhibits of the parties which pertain only to Plaintiff's withdrawn § 1983 malicious prosecution claim (Count Three) against Defendant Trooper Szczecinski.  Also, any SMF of any party which is not supported by citation to the record and any denial of another party's SMF *sans* citation to the record  will not be considered pursuant to Local Rule 56.1, M.D. Pa.   *See Hodge v. United States*, 2009 WL 2843332 (M.D. Pa.)(the Court indicated that a SMF properly citing to evidence in the record and a response thereto were required by LR 56.1.).

Thus, insofar as Defendant Trooper Szczecinski's Doc. 52 Motion to Strike seeks to strike certain paragraphs of Plaintiff's Doc. 44 SMF that are not supported by citation to the record, we will recommend that it be granted under Local Rule 56.1, M.D. Pa.  Since Defendant Trooper Szczecinski, in his Motion to Strike (Doc. 52, p. 2),  states the paragraphs  in Plaintiff 's SMF which are not supported, we do not repeat them herein.   We also agree with Defendant Trooper Szczecinski that certain paragraphs of Plaintiff 's SMF do not pertain to material facts with respect to the sole remaining issue against him, *i.e.* whether the continued detention of Plaintiff on September 22, 2007, violated the Fourth Amendment since there was not sufficient probable cause or reasonable suspicion to detain him.   Since Defendant Trooper Szczecinski, in his Motion to Strike (Doc. 52, p. 4),  states the paragraphs  in Plaintiff 's SMF which are not relevant and material to the sole issue against him, we do not repeat them herein.  Therefore, we will also recommend that Trooper Szczecinski's Doc. 52 Motion to Strike be granted with respect to certain paragraphs of Plaintiff 's SMF (Doc.. 44) which do not pertain to material facts pertaining to the sole remaining issue against Defendant Trooper Szczecinski.

Suffice to say, since we thoroughly review the material facts below pertaining to the sole issue in this case as against Defendant Trooper Szczecinski when we discuss this Defendant 's SMF and Plaintiff's response to it, we do not specifically discuss Plaintiff's SMF.

**IV.  Material Facts.**

   We now consider the material facts with respect to Plaintiff's remaining Fourth Amendment illegal search and seizure claim against Defendant Trooper Szczecinski.   (Doc. 33 & 39).  As mentioned, Plaintiff withdrew his §1983 malicious prosecution claim against Defendant Trooper Szczecinski.

   Since Plaintiff has admitted, in whole or in part the following SMF of Defendant Trooper Szczecinski, and since we find Defendant 's SMF supported by his citation to the record, we quote them below as follows:

   1.  On September 22, 2007, Plaintiff went to Mohegan Sun Casino in the early evening with his wife. Piazza Dep. at 14 (Exhibit 1).

   2.  Plaintiff was a frequent visitor at Mohegan Sun and knew that there  was good communication between employees and security. Piazza Dep. at 159-60.

   3.  From the opening of the casino in November 2006 through the September 22, 2007 incident, Plaintiff visited the casino some 115 times, for a total of over 279 hours.  Some of these visits were on holidays including a nine-hour stay on Christmas Day in 2006. Player History (Exhibit 2). (footnote omitted).

   4.  The incident that gives rise to this law suit occurred on September 22, 2007. Piazza Dep. at 24.

   5.  Mohegan Sun security has a recording of the event at issue in this litigation and, according to Plaintiff, the DVD accurately reflects what is depicted on it. Piazza Dep. at 158-59. (footnote omitted).

6.  Plaintiff admits that the surveillance DVD from Mohegan submitted by Defendant Trooper Szczecinski as evidence (Doc. 33, Ex. 3) accurately depicts what transpired on September 22, 2007.

Upon review of the DVD, we find that Defendant correctly details what has been recorded as follows:

> 6. The video shows the following:
> a. At 6:50:00, Plaintiff is playing slots.
>
> b. At 6:50:22, 6:50:35, 6:50:44, 6:50:49, 6:50:54, 6:51:01, Plaintiff looks toward his left (toward the foreground in the DVD and toward where Wallick and Martin are sitting).
>
> c. At 6:51:11, Mr. Martin gets up from his machine.
>
> d. At 6:51:15, Plaintiff looks toward his left (toward the foreground in the DVD and toward where Wallick and Martin are sitting).
>
> e. At 6:51:32, Mr. Martin crosses to the other bank of slots.
>
> f. At 6:51:39, Plaintiff looks toward his left (toward the foreground in the DVD and toward Wallick and Martin).
>
> g. At 6:51:39, Ms. Wallick turns and faces the direction of Plaintiff and a white envelope is visible on her lap.
>
> h. At 6:51:44, Ms. Wallick crosses to the other bank of slots and the envelope falls from her lap onto the casino floor.
>
> i. At 6:51:59, Plaintiff looks toward his left (toward the foreground in the DVD and toward where Wallick and Martin are sitting) and there are people walking down the center of the aisle.
>
> j. At 6:52:02, the woman walking down the aisle waves at Plaintiff.
>
> k. At 6:52:04, Plaintiff gets up, walks toward the front of the scene (the foreground) and bends over to pick up something.

> l. At 6:52:08, Plaintiff picks up the envelope.
>
> m. At 6:52:11 and 6:52:13, two casino employees are seen in the video and Plaintiff is seen looking in the direction of each employee.
>
> n. At 6:52:14, Plaintiff returns to his machine and cashes out.
>
> o. At 6:52:24, Plaintiff walks away (toward the back of the video) and casino employees are seen.
>
> p. At 6:58:43, Plaintiff is seen at a trash can in another part of the casino and he throws away the envelope.

7.  When he picked up the envelope, Plaintiff looked in it and discovered that it contained gaming vouchers. Piazza Dep. at 30-31.

8.  Also in the envelope was a bank slip (receipt) with information (not her name) relating to Ms. Wallick. Wallick Dep. at 68-70 (Exhibit 4).

Plaintiff also states that the information on the bank slip did not identify Ms. Wallick. Rather, the bank slip only had Ms. Wallick's account information.  Also, Ms. Wallick stated that she did not receive the bank slip back.

9.  When Plaintiff picked up the envelope, he did not ask any of the people seen in the  Mohegan Sun surveillance DVD whether they had lost the envelope and he did not ask any of the people seen in the Mohegan Sun DVD to help him find the owner of the envelope and gaming vouchers. *See* Mohegan Sun DVD; Piazza Dep. at 31-32, 49, 51-52, 56 (admitting also that he did not ask any of the people seen in the video, including the casino employees, for help with respect to finding the owner of the envelope).

10.  Piazza did not drop the envelope on the floor and knew that it did not belong to him. Piazza Dep. at 32, 96.

13

11.  After picking up the envelope, Plaintiff "immediately" cashed out and walked away. Piazza Dep. at 53.

12.  After discovering that she had dropped the envelope containing the gaming vouchers and her bank receipt, Wallick and Martin searched the area and asked people in the area for assistance and whether they saw the envelope.  Wallick Dep. at 39-40, 66-68; Martin Dep. at 11, 34 (Exhibit 5).

Plaintiff also states that as Wallick stood up from the Casino slot machine and was going to cash out and leave the Casino she first realized that a PNC Bank Envelope containing vouchers was lost. Wallick admitted that she lost them. (See Deposition Transcript of Wallick N.T. 16-17 paragraph eighteen at Plaintiff's Compilation [Doc. 46] of Evidence Tab L). When Ms. Wallick realized that she lost the vouchers she admittedly panicked (See Deposition Transcript of Kelly Wallick N.T. 21 paragraph twenty-seven at Plaintiff's Compilation of Evidence Tab L). In a statement that Ms. Wallick gave on the evening in question she indicated "Kevin [Martin]  flagged down security and they searched for the envelope. (See Deposition Transcript of Kelly Wallick N.T. 14, paragraph twenty-eight at Plaintiff's Compilation of Evidence Tab L).

13.  Piazza never asked Wallick or Martin if they had lost the envelope. Wallick Dep. at 64-66; Martin Dep. at 40-42, 46.

14.  Plaintiff knew that the gaming vouchers were worth whatever the amount on the voucher stated. Piazza Dep. at 53.

15.  Plaintiff went to his wife after picking up the envelope. Piazza Dep. at 64.

16.  After seeing his wife, Plaintiff went upstairs. Piazza Dep. at 64.

17.   Plaintiff went through another gaming area and into the cafeteria.  Plaintiff then went down a hallway and into another gaming area.  Plaintiff then turned around and walked into a bathroom.  After leaving the bathroom, Plaintiff threw out the envelope.  Piazza Dep. at 66-69. *See also* Mohegan Sun DVD (showing Plaintiff throwing out the envelope).

18.   Before turning around and entering the bathroom, Plaintiff had been walking toward the promotions desk where casino employees worked.  Piazza Dep. at 71-72, 73.

19.   Plaintiff threw out the envelope into a trash can on another level of the casino. Piazza Dep. at 36-38.  *See also* Mohegan Sun DVD (showing Plaintiff throwing out the envelope).

20.   Plaintiff threw out the envelope because, in his own words: "I knew that only the rightful owner would know that they [the gaming vouchers] were in an envelope." Piazza Dep. at 58. *See also* Piazza Dep. at 162, 163 ("the rightful owner is the only one that would know that those vouchers were in that envelope").

Plaintiff also testified that he threw away the bank envelope so that he would not loose the vouchers since one of the vouchers was sticking out of the envelope.  Doc. 33, Ex. 1, NT 59.

21.   After throwing out the envelope, Plaintiff put the vouchers on his money roll and returned to where his wife was playing slots; he wanted to return upstairs with his wife, in part, because he was hungry. Piazza Dep. at 72, 73.

22.   Before returning to the lower level, Plaintiff played a slot machine on the upper level.  Plaintiff began playing this machine on the upper level at 18:59 (seven minutes after

leaving the area where he picked up the gaming vouchers/envelope) and a minute after he threw away the envelope. Plaintiff played this machine for two minutes. September 22, 2007 Player History (Exhibit 6).

23.   Plaintiff started to play another slot machine.  This slot machine was in yet another area of the casino.  Plaintiff began playing this machine at 19:03 (11 minutes after finding the envelope/gaming vouchers and five minutes after throwing away the envelope). Plaintiff played this machine for nine minutes. Piazza Dep. at 74; September 22, 2007 Player History.

24.   Plaintiff admitted that other casino employees were working that day and, in fact, when he returned to his wife, he spoke with a casino employee but never told this person that he had found an envelope with vouchers in it. Piazza Dep. at 72, 74-75, 126-27.

Also, Plaintiff testified that when he returned to his wife he began to play a slot machine and then he spoke to an unknown female Casino employee.  Plaintiff  stated that he told the  employee he needed to speak with "Paulie" (an alleged Casino employee whom Plaintiff knew) and asked her if she saw him.  Plaintiff did not tell the female employee that he found an envelope on the floor.  Plaintiff states that he was then approached by one unknown PSP trooper (John Doe) and by Defendant Trooper Szczecinski.  (Doc. 46, Ex. A, NT 74-77).

25.-26.   The John Doe trooper asked Plaintiff if he found an envelope on the floor and Plaintiff said yes.  Then Defendant Trooper Szczecinski asked Plaintiff if he still had the vouchers and asked Plaintiff where they were.  Plaintiff pulled the vouchers out from his front

pocket and they were secured in a double rubber band on top of Plaintiff 's money.   (Id., NT 78).

26.   Plaintiff pulled the vouchers out of his pocket, where they had been banded to his money roll. Piazza Dep. at 78-79.

27.   Plaintiff took Defendant Trooper Szczecinski to the trash can where he had thrown out the envelope. Piazza Dep. at 80.

28.   Defendant Trooper Szczecinski did not touch Plaintiff, did not handcuff Plaintiff, and did not pull a weapon on Plaintiff. Piazza Dep. at 82.

29.   Plaintiff testified that he was escorted to an office in the Casino and that he thinks it was only the John Doe trooper who escorted him and not Defendant Trooper Szczecinski.  (Doc. 46, Ex. A NT 84).  However, Kris Karnis, a Mohean Sun Security Lead Officer, testified that he saw a PSP trooper and Defendant Trooper Szczecinski going up the stairway with Plaintiff to an office in the Casino.  (Doc. 46, Ex, V, NT 25).

30.   Since ¶'s 30 of Defendant 's SMF is crucial to Plaintiff 's remaining Fourth Amendment claim against Trooper Szczecinski, we quote Plaintiff 's testimony as follows:

| | |
|---|---|
| A | No, Sir. |
| Q | Did Szczecinski escort you up or was it just the John Doe? |
| A | I'm not sure, sir.  I think it was just the John Doe. |
| Q | How about from where you first encountered John Doe and Szczecinski on the lower level until you got to the trash can, was Szczecinski there with you? |
| A | Yes, sir, I think so. |
| Q | So you think that Szczecinski and John Doe escorted you from the lower level to the trash can. |
| A | I think so, sir. |
| Q | And then you think that the John Doe escorted you from the trash can to the room. |

A     I really don't remember.

Q     But in any event Szczecinski wasn't in the room with you at least at first.

A     No, sir.

Q     I'm correct.

A     Yes, sir.

Q     What happened when you got in the room with this unnamed person?

A     Nothing.

Q     Did the person touch you at all?

A     No, sir, he left.

Q     So you were in the room all alone.

A     Yes, sir.

Q     How long were you in the room?

A     Estimate?

Q     Yes.

A     Half hour

Q     What's the next think that happened either with the unnamed person or Szczecinski?

A     The unnamed came back in.

Q     Were you in there for a half an hour by yourself when the unnamed person came back in?

A     Yes, sir.

Q     Nobody else came and went during that thirty minute period?

A     No, sir.

Q     What happened when the unnamed person came back in?

A     I asked - if I remember right, I asked him, you know, more or less what is happening here.

Q     What was told to you?

A     That I was going to be arrested.

Q     Were you fingerprinted?

A     At the end, sir.

Q     How much time went between - before you were fingerprinted?

A     Estimate?

Q     Yes.

A     Another hour.

Q     Who did the fingerprinting?

A     Szczecinski.

Q     Szczecinski?

A     Yes, sir.

Q     Did he actually take your hands and roll them or how did that work?

A     I think they're picture now, sir.

Q     So did he even have to touch you to take your fingerprints?

18

A       I don't think so, sir.

Q       How about the other trooper?  Did the other trooper ever touch you?

A       No, sir.

Q       And just to be clear, Szczecinski never touched you?

A       No, sir.

Q       So you were fingerprinted and did you have your photograph taken?

A       Yes, sir.

Q       Who did that?

A       Szczecinski.

Q       And after you were fingerprinted and had your photograph taken, what happened?

A       Did you want to skip all the parts in between?

Q       No, just tell me what happened.

A       I'm just asking.  That a big process there.

Q       Okay.  Tell me what happened.

A       Well, when I suggested to him that he go look at the videotape and he would see that I didn't steal anything and that, you know, I never saw who dropped the vouchers and that, you know, he shut me right up and - he told me that he would have me in jail in an hour and he would have it bound over for trial tonight and to shut my mouth.

Q       Was that Szczecinski or was that the unnamed person?

A       John Doe.

Q       Anything else?

A       That was a long hour and half, sir, yes.

Q       Tell me everything you remember.

A       Well, I demanded Mohegan Sun security to be here, into that room.  I asked twice.

Q       Did they come?

A       No.

Q       What else?

A       Well, it's - what do you want to know, sir?

Q       I want to know what happened.

A       Well, twice I asked John Doe for a glass of water in between him going out and in, which there wasn't a comment.  There wasn't a - an answer either way.  Then when I finally got to get my fingerprints, then they were both in the room at the end.

Q       Meaning the unnamed trooper and Szczecinski?

A       Yes, sir.

Q       Were the fingerprints and the photograph taken in that same room where you were?

A       No, sir.

Q       You were moved to another room?

19

A     Yes, sir.

Q     Where was that room?

A     Adjoining that.

Q     Was Szczecinski ever in the first room with you?

A     No, sir.

Q     He was only in the second room for the fingerprinting and the photographing.

A     He only did the fingerprinting and the mug shots, yes, sir.

Q     Anything else that happened during that time?

A     Yes, sir.

Q     What?

A     Then when they were both in the fingerprinting room, again I demanded for Mohegan Sun security.


Q     Anything else?

A     Yes, sir.

Q     What?

A     I asked for a glass of water again.  He said he couldn't do it.

Q     Anything else?

A     Yes, sir.

Q     What?

A     Then I asked for Mohegan Sun again, for Paulie the security guy again I asked for.

Q     Anything else?

A     No, sir.

Q     So after you were fingerprinted and had your photograph taken, did you leave you leave the casino?

A     No, sir, after that they kept me there more after that.  That wasn't - what are you trying to say?

Q     I want to know -

A     I'm still upstairs.

Q     Okay.  What happened after you were fingerprinted and you had your photo take?

A     I remember the phone ringing and I remember them saying soon, soon. I don't know who was on the other end.

Q     Who was saying soon? Was it Szczecinski or the unnamed trooper?

A     The unnamed trooper.

Q     What happened next?

A     Then they processed to come in to tell me that I had a rap sheet and they proceeded to tell me about a DUI I had twenty-five years ago or twenty years ago, whatever.

Q     What else?

A     Then once again I tried to explain to them that I'd like, you know, at least Paulie from Mohegan Sun to verify my character and I like demanded it.

Q     What else?

A     I was told to shut up or I'll be in jail in an hour and he'll bind it over to trial tonight.  He said that on about three different occasions.

Q     Who said that?

A     John Doe.

Q     What happened then?

A     John Doe left and Officer Szczecinski was there and I tried to explain to him why it was so important for Mohegan Sun security to be there.

Q     Why was that?

A     Well, for character because I found a wallet, a woman's wallet, several months before that in the parking lot and I explained to him that it was an active wallet, woman's wallet.  In other words, it had credit cards, money, license, and I explained to him how I found it, brought it into the promotions and he proceeded to tell me in a very light voice you have to tell your attorney that he told me.

Q     Anything else?

A     Yes, sir.  Well, finally we got to leave there.

Q     And how was it that you left?

A     John Doe escorted me downstairs.

Q     And did John Doe escort you out of the casino?

A     No, sir, I went - where the door was situated, I went cattycorner across and if I remember right, I went right to a water machine.

Q     And did you get a drink of water?

A     Yes, sir.

Q     Then what did you do?

A     I remember taking my voucher that I had and cashing it out.

Q     And then did you leave the casino?

A     Then he went to walk me out, sir.

Q     And that was John Doe?

A     Yes, sir.

Q     Did Szczecinski walk you down or walk you out or was it just -

A     No, sir, I don't think so.

Q     When you left the casino -

A     I didn't leave, sir.

Q     At some point you left, didn't you?

A     No, I saw the manager of Mohegan Sun, Mark.

Q     What happened then?

A     I went beeline right to him.

Q     Did either of the troopers prevent you from doing that?

A      Yes, sir.

Q      Who?

A      John Doe.

Q      How did he prevent you?

A      He tried to get in between me and the manager.

Q      Did you talk with this Mark?

A      Yes, sir.

Q      What did you say to him?

A      It happened very quickly, but my wife had came up on the side of John Doe, Officer John Doe, asking him what is my husband being charged with.  So as he was talking to her, I talked to the manager of Mohegan Sun.

Q      What did you say?

A      What did I say?

Q      Yes.

A      What happened here.

Q      What was said to you?

A      He wasn't positive of what happened.  I remember him saying something about Sky.  Sky is Mohegan Sun's security.

Q      That's the cameras that they have all over the casino filming?

A      Yes, sir.

Q      After you spoke with Mark, what happened?

A      Well, as I was speaking with him, Officer John Doe at a high rate of voice said, "I've heard more than enough from you.  You're evicted." Then he said something along the lines of $89.00 might not be a lot to you, mister big shot, but it is a twenty-some - I forget how he said it, a twenty-some year old woman.  And I proceeded to say to him how did I know, who do I know twenty-some years, old know.

Q      At that point did you leave the casino?

A      No, sir.

Q      What happened?

A      Mohegan Sun security came to me.

Q      And what did they do?

A      They told me you're evicted.

Q      Did you then leave the casino?

A      No, sir.

Q      What happened then?

A      My wife was still trying to talk to John Doe and we're our in a promotions area now.

Q      Okay.  Was Szczecinski around during any of this?

A      No, sir.

Q      how did you end up leaving the casino?

| | |
|---|---|
| A | He escorted us out, sir. |
| Q | Who? |
| A | John doe. |
| Q | Szczecinski didn't? |
| A | No, sir. |
| Q | Were you taken out in handcuffs? |
| A | No, sir. |
| Q | Were placed in a patrol car? |
| A | No, sir. |
| Q | Were you taken to jail? |
| A | No, sir, just threatened. |
| Q | But you weren't taken to jail. |
| A | No, sir. |
| Q | Were you taken to a magistrate's office for a hearing or anything like that? |
| A | No, sir. |
| Q | Did you get in your car with your wife and drive home? |
| A | Yes, sir. |
| Q | The police didn't stop you from doing that. |
| A | No, sir. |

(Doc. 46, Ex. A, NT 84-95).

31.  Plaintiff was never in handcuffs, never placed in a police car, never taken to jail, never taken to a magistrate's office. In fact, Plaintiff left the casino with his wife and drove away. Piazza Dep. at 94-95.

32.  Defendant Trooper Szczecinski testified that on September 22, 2007, he was alerted to the loss of a voucher by Mohegan Sun surveillance operated by Mohegan Sun security personnel. (Doc. 46, Ex. Q, NT 26).  Defendant Trooper Szczecinski was told that they were investigating lost vouchers on the casino floor.  (Id., NT 28).  In the State Police Report prepared by Defendant Trooper Szczecinski, he indicated that Ms. Wallick dropped vouchers and that she dropped them by mistake.  (Id., NT 36).

33.  Defendant Trooper Szczecinski testified that he went to the surveillance room and reviewed the video before he went out to the Casino floor and approached Plaintiff.  (Id., NT 37).

Also, in his Declaration (Doc. 33, Ex. 7, ¶'s 4-5), Defendant Trooper Szczecinski averred as follows:

> Defendant [Trooper Szczecinski] went to the surveillance room at Mohegan Sun and
> reviewed video. Defendant reviewed this video before approaching Plaintiff and it showed the following: Plaintiff sitting at a slot machine and playing the slot machine; a man in the foreground of the scene who got up and moved from one bank of slot machines to the other across the aisle; a woman in the foreground of the scene who got up and moved from one bank of slot machines to the other across the aisle; Plaintiff turning to his left several times and looking toward the foreground of the scene where the man and woman were located; the woman turning toward Plaintiff and exposing on her lap a white envelope and the same time that Plaintiff was looking toward the woman; the woman getting up from her machine, crossing to the other bank of slot machines and dropping the white envelope; Plaintiff turning to his left again and getting up and picking up the envelope that the woman dropped; Plaintiff returning to the slot machine he was playing and immediately cashing out of the machine and leaving the scene; and Plaintiff not asking anybody in the video (the man, the woman, casino security who is seen in the video after Plaintiff picked up the envelope, and another casino employee who is seen in the video after Plaintiff picked up the envelope) whether any of these persons lost the envelope or could help him find the owner of the envelope. Szczecinski Decl. ¶¶4-5.

Further, in his deposition, Defendant Trooper Szczecinski testified that in his Affidavit of Probable Cause with respect to the criminal complaint he filed against Plaintiff, he indicated that he had a discussion with Ms. Wallick and Mr. Martin before he reviewed the video in the Mohegan Sun surveillance department.  (Doc. 46, Ex. Q, NT 99).  However, Defendant Trooper

Szczecinski testified that his Affidavit was incorrect since he definitely went to the surveillance department first and reviewed the video before he spoke to Wallick.  (Id.).

34.  Defendant also viewed other video that showed Plaintiff walking past several casino employees (including security) and showed that Plaintiff did not speak to any of these people. Szczecinski Decl. ¶6.

35.  Defendant also viewed video that showed Plaintiff, shortly after picking up the envelope, discarding something into a trash can. Szczecinski Decl.¶7.

36.  Defendant interviewed Wallick and Martin and both gave written statements to Defendant. Szczecinski Decl. ¶8.

37.  Wallick was adamant that she wanted to press charges against Plaintiff and she told Defendant this.  Szczecinski Decl. ¶11. *See also* Martin Dep. at 26-27, 28 (testifying that he and Wallick were asked whether they wanted to press charges and that the decided to press charges).[5]

38.  Defendant Trooper Szczecinski approached Plaintiff and he admitted to Defendant that he had the vouchers on him. Plaintiff produced them for Defendant and they had been inside of his money roll. Defendant also asked Plaintiff what happened to the envelope and Plaintiff took Defendant to the trash can (previously seen on the video) where Plaintiff had thrown out the envelope. Defendant recovered the envelope from the trash can. Szczecinski Decl. ¶¶9-10.

---

5.   While Plaintiff denies ¶ 37 of Defendant 's SMF which Defendant supports with citation to the record, Plaintiff  does not cite to the record to support his denial.   Thus, ¶ 37 is accepted.

39.   During the incident, Plaintiff told Defendant Trooper Szczecinski that he had previously found a purse/wallet and had turned it in. Defendant believed that Plaintiff, having said this, certainly knew how to turn in property that did not belong to him. Plaintiff also told Defendant that he looked for names on the ticket but, given Plaintiff's statements that he was a frequent visitor to the casino, he would know that gaming vouchers contained no such identification. Szczecinski Decl. ¶12.

40.   While Defendant Trooper Szczecinski states in ¶ 40 of his SMF that he believed he had probable Cause to question Plaintiff, bring Plaintiff to the PSP Office at the Casino, fingerprint Plaintiff , photograph Plaintiff and file criminal charges against Plaintiff, and Plaintiff denies it, we examine the record below regarding the probable cause issue.

41.   Defendant Trooper Szczecinski filed charges against Plaintiff for violating the Pennsylvania Crimes Code -- 18 Pa.C.S. § 3924 (Theft of Property Lost, Mislaid or Delivered by Mistake) and 18 Pa.C.S. § 3925(a) (Receiving Stolen Property) -- on September 23, 2007 or September 24, 2007:

> IN THAT, on or about said date, THE DEFENDANT did come into control of property, namely (Four redemption vouchers with a total value of $89.00), belonging to (Kelly WALLICK and Kevin MARTIN), which said DEFENDANT knew to have been lost, mislaid, or delivered by mistake as to the nature or amount of the property or the identity of the recipient and, with the intent to deprive the owner thereof, said actor did fail to take reasonable measures to restore the property to a person entitled to have it, in violation of Section 3924 of the PA Crimes Code.
> IN THAT, on or about said date, THE DEFENDANT did intentionally receive, retain or dispose of movable property, namely (Four redemption vouchers with a total value of $89.00), belonging to (Kelly WALLICK and Kevin MARTIN), with no intent to restore it to the owner, knowing that such property was stolen, or believing that it had been stolen, in violation of Section 3925(a) of the PA Crimes Code.

Szczecinski Decl. ¶17.

42.  To support these charges, Defendant Trooper Szczecinski completed an Affidavit of Probable Cause and stated as follows:

> On Saturday, September 22, 2007, at approx. 1910 hours, I conducted a in-person interview with a Kelly WALLICK and a Kevin MARTIN. I interviewed both of these people at the Mohegan Sun at Pocono Downs Casino located in Plains Twp., Luzerne County. Both related to me that they were in possession of four (4) redemption or "washout" vouchers produced from slot machines at the casino that same day. They stated the value of the vouchers were $30.00, $25.00, $23.00, and $11.00. The sum total of the four vouchers was $89.00. They stated they somehow lost the vouchers and wanted to make a report. I then checked with the Mohegan Sun at Pocono Downs Surveillance Department. The Surv. Dept. retrieved digital Surv. Video recordings from the area of the casino where the victims were located. The recorded video shows Kelly WALLICK seated at a slot machine with a white bank envelope in her lap. During my in-person interview with her she stated that she had just placed all four vouchers into this envelope for safe keeping. Kelly WALLICK is then observed getting up from the machine and going over to another machine behind her. When she gets up from the first machine, the envelope containing the four vouchers falls from her lap onto the main floor of the casino. The accused, Richard Anthony PIAZZA, is then observed on the video walking over to the envelope, picking it up, looking inside, and walking away with it. It is observed that he never asked the people in the general area of the envelope, to and include the two victims, if it belongs to them. It is also observed that he walks past a security guard with the envelope and does not attempt to report the finding to him. It is further observed that the accused is later observed on the video recording throwing something away in a upper level casino trash can.  I then confront the accused in the casino. I identify myself to him and relate to him what was observed. I ask him if he still has the vouchers or if he played them off in a machine. He then goes into his front pants pocket and pulls out a roll of money. On the inside of the roll of money was the four vouchers which he hands to me. I then asked him what happened to the white bank envelope that the vouchers were in.  He then takes me to the same trash can observed in the video recording and states to me that he removed the four vouchers and threw away the envelope.

Szczecinski Decl. ¶17. The facts set forth in the Affidavit of Probable Cause were true and accurate based on Szczecinski's investigation. Szczecinski Decl. ¶¶17-18.

See also Doc. 46, Ex. X.

43.  The Notice of Preliminary Hearing was signed by District Justice Diana Malast on, September 27, 2007. Szczecinski Decl. ¶18.

44.  Plaintiff received this notice -- dated September 27, 2007 -- in the mail to appear at a preliminary hearing, which was to occur in November 6, 2007. Piazza Dep. at 97-98, 105.

45.  Plaintiff attended the hearing on November 6, 2007 (for about 60-75 minutes) but the charges were dropped because Szczecinski forgot about the hearing and, thus, did not attend. Szczecinski Decl. ¶20. *See also* Szczecinski Decl. ¶20 (Szczecinski candidly admitting that he received a written reprimand for this).

46.  Before the incident on September 22, 2007, and after it, Plaintiff had no other contact with Defendant.  Piazza Dep. at 98, 115; Szczecinski Decl. ¶21.

47.  From the time he left the casino on September 22, 2007, Plaintiff was free to come and go to his job and stay at his home. Piazza Dep. at 98-99.

48.  Plaintiff did not have a passport at that time and did not have his license taken and, after he left the casino, Defendant did not restrict his movement in any manner and did not put him in jail and did not handcuff him. Piazza Dep. at 99-100, 101-04 (admitting he was never cuffed, taken to prison, never told he could not leave Pennsylvania or the country, he never posted bail, he never had his license taken, that he drove himself to the hearing, the police did not take him to the hearing, he was never given any type of electronic monitoring, and that he never had any trial, and that he was at the hearing for about 75 minutes, and that

he never had to appear for anything related to this incident again). *See also* Szczecinski Decl.

¶¶14-15, 19.

     49.   Q     What was the total time that you were with Szczecinski on the day of the casino incident if you had to estimate?

A [Plaintiff] You mean John Doe, sir.  Szczecinski I was only with for a matter of five minutes.  He did the - he only did the fingerprints and the mug shot, sir.  John Doe did the rest.

Q     Did you review the video with either John Doe or Szczecinski during the day, the video that we were watching earlier her today?

A     No, but I'm the one who suggested to John Doe.

BY ATTORNEY COLEMAN:     He didn't ask that, Rich.  Did you review it with either of the two officers?

A     No, sir.

Q     Did Szczecinski delay at all in taking your fingerprints or photograph when he came into the room or was that done pretty quickly after he showed up?

A     No, I was in the other room with John Doe.

Q     Right, I understand that.  I'm asking about Szczecinski though.

A     No, sir.  Once I went in there, that was a little more of a (deponent snapping fingers.)

Q     That happened pretty quickly?

A     Compared to sitting in the other room, yes, sir.

Q     You were never taken on the 22nd to the police barracks either, were you?

A     What day is that, sir?

Q     The day of the casino incident.

A     No, sir.

Q     Did Szczecinski ever tell you you were under arrest or was it John Doe?

A     John Doe.

Q     Did they tell you you were under arrest or you were going to be placed under arrest?  What did they specifically tell you?

A     He said you are going to be - you are under - how it was put to me is you're going - paperwork is going to be filed - you're charged.  That's the word - charged.

     **************************************************************

A     I think it was Szczecinski who did the fingerprints.

> Q    So you think he's the one that filed the charges.  The unnamed person
>       didn't file the charges.
> A    No, sir.
> Q    That's correct.
> A    Yeah.
> Q    And Szczecinski only fingerprinted you and photographed you and the
>       unnamed person did everything else on the night of the 22nd.
> A    Yes, sir.

Plaintiff also averred in his Affidavit that it was about one to one and ½ hours total time from the time he was taken from the Casino floor to the PSP Office and released. (Doc. 46, Ex. C, ¶ 20).

50.    As stated, Plaintiff withdrew his §1983 malicious prosecution claim against Defendant Trooper Szczecinski.  Also, as stated, we examine the record below regarding the probable cause issue.

**V.  Discussion.**

1.   *Trooper Szczecinski's Doc. 52 Motion to Strike the Affidavits of Plaintiff's Wife and Plaintiff, Doc. 46, Exs. B & C*[6]

Defendant Trooper Szczecinski argues that several exhibits submitted by Plaintiff, including the Affidavits of Plaintiff and his wife, should be struck since they are not proper exhibits.  (Doc. 52, pp. 7-8).

We have reviewed the Affidavits of Plaintiff and his wife, as well as the briefs of the parties, and we do not find that the Affidavits of Plaintiff and his wife should be struck.

In *Coleman v. Cerski*, 2007 WL 2908266, *3 (M.D. Pa. 10-4-07), the Court instructed:

> Although Rule 56(e), which sets forth the form that affidavits must take, does not specifically provide for a motion to strike, courts have held that a party wishing to challenge an opponent's affidavits for containing defects under Rule 56(e) should move to strike the affidavits or else waive any objection to the defects. *See, e.g., In Re Unisys Sav. Plan Litig.,* 74 F.3d 420, 437 n. 12 (3d Cir.1996); *Grine v. Coombs,* 214 F.R.D. 31, 338-39 (W.D.Pa.2003).
>
> Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits in support or opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." If portions of an affidavit do not meet these standards, it is appropriate for a court to disregard, or strike, those portions from the record for purposes of resolving the summary judgment motion.

In *Summy-Long v. Penn. State University*, 2009 WL 811616, *2 (M.D. Pa. 3-26-09),

---

6**.**   The Affidavits of Plaintiff's wife and Plaintiff are also docketed as  Docs. 41 & 42.  However, Mrs. Piazza's Doc. 41 Affidavit is not signed and notarized as it is at Doc. 46, Ex. B.

the Court stated:

> Although affidavits are not required to sustain or overrule a motion for summary judgment, Rule 56(e) of the Federal Rules of Civil Procedure sets forth three requirements that a submitted affidavit must meet. It requires that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). The Third Circuit has emphasized that "the affiant must ordinarily set forth facts, rather than opinions or conclusions.  An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant's burden." *Maldonado v. Ramirez,* 757 F.2d 48, 51 (3d Cir.1985) (internal citations omitted). In other words, an affidavit, or portions of an affidavit, are only admissible for purposes of summary judgment to the extent they are at least potentially admissible at trial. *See Hurd v. Williams,* 755 F.2d 306, 308 (3d Cir.1985) (refusing to consider "facts" set forth in an affidavit opposing summary judgment because the facts were actually opinions inadmissible under Rule 701 of the Federal Rules of Evidence). **Statements of belief, no matter how sincere, are properly subject to a motion to strike because they do not meet the personal knowledge requirement**. *Fowler v. Tillman,* 97 F.Supp.2d 602, 607 (D.N.J.2000) ("Affidavits speculating as to motivations but containing no factual support do not conform to the rule, and statements prefaced by the phrases, 'I believe' or 'upon information and belief' are properly subject to a motion to strike.") (internal citations omitted).

(Emphasis added).

Thus, "Plaintiff's [Declaration] should only consist of those matters of which she has personal knowledge, and it should state only facts about which she is competent to testify and that would be admissible at trial." *Summy-Long v. Penn. State University*, 2009 WL 811616, *2.

Moreover, "Federal Rule of Civil Procedure 56(e) requires affidavits to be "made on personal knowledge" and to "show affirmatively that the affiant is competent to testify to the matters stated therein." Affidavits relating to a motion for summary judgment that are conclusory and lacking in specific facts fail to satisfy Rule 56(e) and are disregarded. *Shaw by*

*Strain v. Strackhouse,* 920 F.2d 1135, 1144 (3d Cir.1990) (citing *Maldonado v. Ramirez,* 757 F.2d 48, 51 (3d Cir.1985)).  *Coleman v. Cerski*, 2007 WL 2908266, *4.

Specifically, Defendant  Trooper Szczecinski states that paragraphs 4,  6-21 of Mrs. Piazza's Affidavit  (Doc. 46, Ex. B) and paragraphs 10-13 of Plaintiff 's Affidavit  "are riddled with hearsay and not based on personal knowledge."   (Doc. 53, p. 7).   We disagree with Defendant.

We find that the stated paragraphs of the Affidavits of Plaintiff and his wife are averments about which they have affirmatively shown that they are competent to testify.

We do agree with Defendant  Trooper Szczecinski that any exhibits submitted by Plaintiff which do not pertain the sole Fourth Amendment claim against him and only pertain to either Plaintiff 's withdrawn §1983 malicious prosecution claim against him or Plaintiff's negligence claim against Defendant CT Corporation should not be considered as to him.

*2.  Summary Judgment Motions, Docs. 32 & 40*

Plaintiff 's remaining Fourth Amendment illegal search and seizure claim against Defendant Trooper Szczecinski is brought pursuant to §1983.  In a § 1983 civil rights action, the Plaintiff must prove the following two essential elements:  (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct complained of deprived the Plaintiff of rights, privileges or immunities secured by the law or the Constitution of the United States.  *Parratt v. Taylor*, 451 U.S. 527 (1981); *Kost v. Kozakiewicz*, 1 F. 3d 176, 184 (3d Cir. 1993); *Stawarz v. Rojas*, 2007 WL 1653742, *3. Further, § 1983 is not a source of substantive rights.  Rather, it is a means to redress violations of federal law by state actors.  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).  *See also Holocheck v. Luzerne County Head Start, Inc.*, 385 F. Supp. 2d 491, 498-499 (M. D. Pa. 2005); *Slater v. Susquehanna County*, 613 F. Supp. 2d 653, 660 (M.D. Pa. 2009) (citations omitted); *Stankowski v. Farley*, 487 F. Supp. 2d 543, 550 (M.D. Pa. 2007).

Initially, we agree with Defendant Trooper Szczecinski that the only claim remaining against him is whether his detention of Plaintiff was permissible under the Fourth Amendment. Insofar as Plaintiff also asserts a Fourth Amendment illegal search claim against Defendant Trooper Szczecinski, we find that Defendant is correct (Doc. 34, p. 14) and that the undisputed evidence detailed above shows that he did not search Plaintiff at any time.  Rather, Plaintiff admits that when Defendant Trooper Szczecinski  asked him if he still had the vouchers, he (Plaintiff ) answered yes and produced them.   (Doc. 42, ¶ 12.).  Thus, Plaintiff volunteered to show Defendant Trooper Szczecinski where he put the vouchers he found on the Casino floor, *i.e.* in his money roll in his pants pocket.  Thus, to the extent Plaintiff asserts a  Fourth

Amendment illegal search claim against Defendant Trooper Szczecinski, we will recommend that Defendant's Summary Judgment Motion be granted.

As discussed below, we find material facts in dispute regarding whether Defendant Trooper Szczecinski's detained Plaintiff in violation of the Fourth Amendment.

Whether the evidence sufficiently shows  that Plaintiff suffered deprivation of liberty under the Fourth Amendment consistent with the concept of seizure is the remaining issue as against Defendant Trooper Szczecinski.   Therefore, we must decide if the Plaintiff has established that he suffered a deprivation of liberty consistent with the concept of seizure as a consequence of Defendant Trooper Szczecinski's conduct.   *See Penberth v. Kranjnak*, 2008 WL 509174 (M.D. Pa. 2-21-08), affirmed 347 Fed. Appx. 827 (3d Cir. 10-9-09).

Plaintiff argues that since he was detained by PSP for a total period of time between one to one and one half hours and since there was no reasonable articualtable suspicion that a crime occurred, he has shown that he was seized by Defendant Trooper Szczecinski in violation of the Fourth Amendment.  Defendant Trooper Szczecinski contends that after his initial questioning of Plaintiff on the Casino floor and Plaintiff 's voluntary production of the vouchers, his only detention of Plaintiff was about five minutes when he fingerprinted and photographed Plaintiff.

Also, the evidence shows that Defendant Trooper Szczecinski did not file the theft charges  against Plaintiff at that the time of the incident, since after Plaintiff  was questioned in the PSP office he processed and released.   Thus, Defendant Trooper Szczecinski argues that

Plaintiff  was not sufficiently seized by him as required to demonstrate a Fourth Amendment claim.

In *DiBella v. Borough of Beachwood*, 407 F. 3d 599, 603 (3d Cir. 2005), the Court stated that "[t]he type of constitutional injury the Fourth Amendment is intended to redress is the deprivation of liberty accompanying prosecution, not prosecution itself." (citation omitted).

The *DiBella* Court found that since the plaintiffs were only issued a summons, they were not arrested, they did not have to post bail, they were free to travel, and they did not have to report to pre-trial services, there was no seizure of plaintiffs sufficient to establish a Fourth Amendment violation with respect to a § 1983 malicious prosecution claim.  *Id.*

In *Perkins v. Staskiewicz*, 2010 WL 2510191, *4 (M.D. Pa. 6-17-10), the Court stated:

> In *DiBella,* the Third Circuit Court of Appeals ruled that where the plaintiffs were free to travel, never posted bail, were never arrested, and were constrained only in that they were required to attend court proceedings, they did not suffer a deprivation of liberty sufficient to support a Fourth Amendment malicious prosecution claim.   DiBella, 407 F.3d at 602-03. By contrast, in *Gallo,* the Third Circuit Court of Appeals found that the four requirements of a weekly pretrial services check-in, a $10,000 bail posting, a restriction on out-of-state travel, and mandatory attendance at court proceedings combined to deprive the plaintiff of his liberty sufficient to constitute a seizure, though it was admittedly a "close question. *Gallo,* 161 F.3d at 222. Many courts within this district have had the opportunity to compare the findings in *DiBella* and *Gallo,* and have determined that, absent physical detainment, travel restrictions, bail posting, and mandatory pretrial services check-ins, a Fourth Amendment seizure does not occur. *See, e.g., Hanks v. County of Delaware,* 518 F.Supp.2d 642, 651 (E.D.Pa.2007) ( "Mere attendance at a trial or a hearing does not qualify as a Fourth Amendment seizure."); Ankele v. Hambrick, 286 F.Supp.2d 485, 497 (E.D.Pa.2003) ("[The plaintiff] was never incarcerated, restricted to a geographic area, compelled to contact pre-trial services, or deprived of his driver's license.... Accordingly, these restrictions do not amount to a seizure for purposes of the Fourth Amendment."); *Bristow v. Clevenger,* 80

F.Supp.2d 421, 430 (M.D.Pa. 2000) (no seizure where plaintiff was only "processed for a criminal record by being fingerprinted and photographed ... she attended a pretrial conference, and she attended a judicial proceeding").  Looking at the totality of the restrictions placed on Plaintiff, including the fingerprinting and photographing, the restraints incurred by Plaintiff were slight in comparison to those placed upon the plaintiff in *Gallo,* which itself was deemed a close question. Plaintiff incurred only one of the four *Gallo* restrictions. Most notably, Plaintiff was at all times free of travel restrictions, which was the most strongly-weighted factor in the *Gallo* decision. Additionally, did not have to report to pretrial services at any time, let alone on a weekly basis for a period of eight months, as did the plaintiff in *Gallo.* Last, the Court emphasizes that Plaintiff did not post any money for bail and was never arrested or physically detained, though he was subjected to processing. When these facts are applied to case law, it is clear that the slight restrictions imposed upon Plaintiff's liberty are much more akin to those imposed upon the plaintiffs in *DiBella,* and are far less than those incurred by the plaintiff in *Gallo.* Accordingly, the Court finds that, as a matter of law, Plaintiff did not suffer a deprivation of liberty consistent with the concept of seizure as a result of the forgery and tampering charges brought against him.

In his Affidavit, Plaintiff avers as follows:

11.  While seated at a slot machine looking toward the hall area a female Casino employee walked by and I inquired of her "I need to speak with Paulie.  Have you seen him."  As I was having this discussion I was approached by two individuals in suites who identified themselves as members of the Pennsylvania State Police.  The individuals who I now know to be Corporal Roger Stipack of the Pennsylvania State Police asked me "Did you find something".  I responded "Thats is exactly what happened, I found and saw the envelope in the middle of the aisle."

12.  The other state trooper who I know now to be Trooper Curtis Szczecinski then asked me if I cashed out the vouchers or played them off.  I indicated "Absolutely not."  He asked if I still had them and I answered yes and then I produced them.  It was at the time that the Trooper demanded that I cash out and I was told "You're coming with us."

13.  I tried to explain to the Troopers what my intentions were with regard to the vouchers and I was told in a loud and threatening tone "Shut your mouth" and "Your're coming with us."

14.  There was a clear show of authority by these officers and I had no choice but to submit to them.

15.  I did not feel that I had any choice but to go with them.  My wife was close by and I had no choice.

16.  The troopers asked me where the bank envelope was and I promptly told them where I discarded it and we walked to the upper area of the Casino where the trash receptacle was located.  I had no choice as the Troopers escorted me from the lower level slot are of the Casino to the upper level but to follow the directions fo the state troopers.  I could not say a word.

17.  At one time during the approximate one to one and half hours that I was in the custody of Trooper Szczecinski and the Pennsylvania State Police I told him that I felt what the state troopers were doing was a mistake and I was promptly told to "Shut up" or "I'm going to jail and the Trooper will personally bind this over for trial."

18.  I remained in the State Police Office for a period of approximately one to one and a half hours at which time I was fingerprinted, and I had a mug shot taken.  This was demoralizing and demeaning to me.

19.  At no time after I picked up the bank envelope containing Casino vouchers did I ever leave the Casino or did I utilize the vouchers in any slot machine or attempt to "cash out" these vouchers for United States currency.

20.  I was in the presence of Trooper Szczecinski from the time of the initial confrontation on the Casino floor until I was escorted from the Pennsylvania State Police Gaming Enforcement Office approximately one to one and a half hours later.

(Doc. 42, ¶'s 11-20).

We find the evidence disputed as to how long Plaintiff was in the presence of Defendant Trooper Szczecinski.  It is not clear if after Defendant Trooper Szczecinski questioned Plaintiff on the Casino floor, Defendant Trooper Szczecinski escorted Plaintiff up to the PSP office for further questioning.  Also, it is not clear if Plaintiff was in the custody of Defendant Trooper Szczecinski during the one to one and one half hours of questioning in the PSP office regardless if Trooper Szczecinski was in the room with Plaintiff during his questioning.

Thus, we find that the material facts are disputed as to whether Plaintiff has established a Fourth Amendment seizure by Defendant Trooper Szczecinski.

We also find that the evidence is disputed as to whether Defendant Trooper Szczecinski had probable cause to detain Plaintiff with respect to the vouchers Plaintiff found on the Casino floor.

In *Reedy v. Evanson*, 615 F. 3d 197, 211 (3d Cir. 2010), the Third Circuit stated that "[i]t is well-established that the Fourth Amendment 'prohibits a police officer from arresting a citizen except upon probable cause.'" (citations omitted).  The *Reedy* Court also stated:

> Probable cause "requires more than mere suspicion [.]" *Orsatti,* 71 F.3d at 482. However, it does not "require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams,* 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Rather, "probable cause to arrest exists when the facts and circumstances within  the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti,* 71 F.3d at 483; *see also Wilson v.Russo,* 212 F.3d 781, 789 (3d Cir.2000) ("Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." (citation omitted).). "Probable cause need only exist as to [one of the] offense[s] that could be charged under the circumstances." *Barna v. City of Perth Amboy,* 42 F.3d 809, 819 (3d Cir.1994). In analyzing whether probable cause existed for an arrest, we must take a "totality-of-the-circumstances approach." *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

In *Irick v. City of Phila.*, 2008 WL 2120171, *8 (E. D. Pa.), the Court stated:

> Typically, the existence of probable cause in a § 1983 action is a question of fact. *Wilson v. Russo,* 212 F.3d 781, 796 (3d Cir.2000) (*citing Sherwood v. Mulvihill,* 113 F.3d 396, 401 (3d Cir.1997)); *Groman,* 47 F.3d at 635. A court, however, can conclude that probable cause did not exist as a matter of law if the evidence viewed in the light most favorable to the non-moving party would not reasonably support a finding of probable cause. *See*

*Sherwood,* 113 F.3d at 401. It is the Court's role to determine whether the objective facts available to the police officer at the time of the arrest would justify a reasonable belief that an offense was being committed. *Victory Outreach Ctr. v. Melso,* 313 F.Supp.2d 481, 488 (E.D.Pa.2004) ( *citing Johnson v. Campbell,* 332 F.3d 199, 211 (3d Cir.2003)). Thus, the Court must examine whether any facts in the record reasonably support a finding of a lack of probable cause.

"Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 788 (3d Cir.2000) ( *citing Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir.1995). [FN2]. Thus, the probable cause standard does not turn on the actual guilt or innocence of the arrestee, but rather, whether the arresting officer reasonably believed that the arrestee had committed the crime." *Radich v. Goode,* 886 F.2d 1391, 1397 (3d Cir.1989); *see also Barna,* 42 F.3d at 819 ("The test for an arrest without probable cause is an objective one, based on the facts available to the officers at the moment of arrest."). The good faith or bad faith of the arresting officer is entirely irrelevant. *Whren v. United States,* 517 U.S. 529, 531 (1998).

FN2. "The validity of an arrest is determined by the law of the state where the arrest occurred." *United States v. Myers,* 308 F.3d 251, 255).

In *Ulitchney v. Jeff Ruzicki*, 2010 WL 5494050, *4 (3d Cir. 1-5-11), the Court stated:

"A seizure occurs '[w]henever an officer restrains the freedom of a person to walk away.' " *Curley v. Klem,* 298 F.3d 271, 279 (3d Cir.2002) (quoting *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). And, "[t]he test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.' " *Kopec v. Tate,* 361 F.3d 772, 776 (3d Cir.2004) (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

In the instant case, based on the evidence and based on oral argument, we find too many disputed facts as to whether Defendant Trooper Szczecinski had probable cause to

40

believe that Plaintiff committed a theft of Wallick's vouchers.  There is no dispute that Wallick

accidentally dropped the envelope containing her vouchers on the Casino floor and,  that she

and Martin did not report that they were stolen from them.  The evidence is not clear if Plaintiff

actually saw Wallick drop the envelope or if he merely saw them on the floor after Wallick left

the area.  Also, the evidence is not clear if Plaintiff was really trying to look for Casino

employees he knew to turn in the vouchers which did not have any way to identify to whom

they belonged.  We find that the evidence is disputed as to whether  Defendant Trooper

Szczecinski was personally involved with  the one to one and one half hours that Plaintiff was

seized and detained in this case.  It is not claer if Defendant Trooper Szczecinski escorted

Plaintiff to the PSP office after his initial contact  with Plaintiff and if Plaintiff was then detained

under Defendant Trooper Szczecinski's direction for one to one and one half hours  based on

Plaintiff's finding and picking up a lost envelope containing vouchers worth less than $100.

Moreover,  we find the evidence disputed as to whether Plaintiff 's seizure was

reasonable under the circumstances of this case, *i.e.* Plaintiff was detained from 60 to 90

minutes by PSP for picking up an envelope containing vouchers on the Casino floor with no way

to determine the owner of the envelope.  We also find the present case distinguishable from

*Penberth* since Plaintiff in *Penberth* was not seized and detained by police and, our Plaintiff was

undisputedly seized and detained by PSP from 60 to 90 minutes simply over finding and picking

up a lost envelope, *sans* any name, containing vouchers worth less than $100.

Also, Plaintiff was never convicted of the theft charges filed against him by Defendant

Trooper Szczecinski.  Further, even if the charges were dismissed when Defendant Trooper

41

Szczecinski failed to appear at Plaintiff 's hearing before the Magisterial District Judge, there is no evidence that Defendant Trooper Szczecinski tried to re-file the theft charges against Plaintiff by obtaining approval of the District Attorney under PA Rules of Crim. P. 544(a).  *See Jackson v. Nassan*, 2009 WL 2707447, *5 (W.D. Pa. 8-26-09)("According to Pennsylvania Rules of Criminal Procedure, a police officer cannot refile charges without the authorization of a Commonwealth attorney, either implicitly through her presence at the preliminary hearing or explicitly through written authorization.  Pa.R.Crim.P. 544; *Com. v. Bowman*, 840 A. 2d 311, 316 (Pa.Super. Ct. 2003))."  In fact, Defendant CT Corporation states in its SMF (Doc. 48, ¶39) that the District Attorney decided not to re-file the charges against Plaintiff.

Therefore, we find the disputes as to the stated facts and whether Defendant Trooper Szczecinski's conduct was objectively reasonable with respect to the detention of Plaintiff for 60 to 90 minutes and the filing of theft charges against Plaintiff.   We find these disputes warrant submitting Plaintiff's Fourth Amendment claim against Defendant Trooper Szczecinski to a jury.

Finally, since we find the evidence disputed as whether the conduct of Defendant Trooper Szczecinski violated Plaintiff 's clearly established Fourth Amendment right against unreasonable seizures, we do not find that this Defendant is entitled to qualified immunity on the stated remaining claim against him.

The Court in *Brockington v. City of Philadelphia*, 354 F. Supp.2d 563, 567-68 (E.D. Pa. 2005), stated as follows:

> The doctrine of qualified immunity provides that "law enforcement officers acting within their professional capacity are generally immune from trial 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v.*

*Russo,* 212 F.3d 781, 786 (3d Cir.2000) (quoting *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The qualified immunity defense involves a two-step analysis.

First, a court must "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson,* 212 F.3d at 786 (citation omitted). Second, if plaintiff has alleged such a deprivation, a court should "proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.* This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Curley v. Klem,* 298 F.3d 271, 277 (3d Cir.2002) (quoting *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). A constitutional right is established if it is sufficiently clear and well-defined so that "a reasonable official would understand that what he is doing violates that right." *Carswell v. Borough of Homestead,* 381 F.3d 235, 242 (3d Cir.2004) (citations omitted). Even if a reasonable official would so understand, the defendant may still be shielded from liability if he made a reasonable mistake as to what the law requires. *Id.* Although it is important to resolve qualified immunity questions at the earliest possible stages of litigation, the importance of resolving qualified immunity questions early "is in tension with the reality that factual disputes often need to be resolved before determining whether defendant's conduct violated a clearly established constitutional right." *Curley v. Klem,* 298 F.3d 271, 277-78 (3d Cir.2002). A decision as to qualified immunity is "premature when there are unresolved   disputes of historical facts relevant to the immunity analysis." *Id.* at 278.

Further, "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Showers v. Spangler,* 182 F.3d 165, 171 (quoting *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1699-1700, 143 L.Ed.2d 818 (1999) and *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed .2d 396 (1982)).

When addressing qualified immunity claims, the court must   proceed in a  two prong analysis.  *Id.; Sharrar v. Felsing,* 128 F.3d 810, 826 (3d Cir.1997); *see also Rouse v. Plantier,* 182 F.3d 192 (3d Cir.1999) (setting forth the same general standard for analyzing qualified immunity, but in a three step inquiry). First, the court  must determine if the  conduct alleged by the plaintiff violated a clearly established constitutional right.  *Id.; see also Johnson v. Horn,* 150 F.3d 276, 286 (3d Cir.1998). If so, the court must then determine if the unlawfulness of the conduct  would have been apparent to an

43

objectively reasonable official. *Id.* Thus,"whether an official protected by
qualified immunity may be held personally liable for an allegedly unlawful
official action generally turns on the 'objective legal reasonableness' of the
action, assessed in light of the legal rules that 483 U.S. 635, 639, 107 S.Ct. 3034,
97 L.Ed.2d 523 (1987) (citation omitted).

Therefore, "[u]nless plaintiff's allegations state a claim of a
violation of clearly established law, a defendant pleading qualified immunity
is entitled to dismissal before the commencement of discovery." *P.F. v.
Mendres,* 21 F.Supp.2d 476 (D.N.J.1998) (quoting *Anderson v. Creighton,* 483
U.S. 635, 640 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); *Mitchell v.
Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

As discussed above, we find that Plaintiff has stated a claim for violation of his Fourth

Amendment right against   Defendant Trooper Szczecinski and that this right was clearly

established.  Also, as discussed above, we find that factual disputes exist as to whether

Defendant Trooper Szczecinski's conduct violated Plaintiff 's Fourth Amendment right against

unreasonable seizures.  Thus, we do not find that Defendant Trooper Szczecinski is entitled to

qualified immunity at this stage of the case.

## VI. Recommendation.

Based on the foregoing, we respectfully recommend that Defendant Trooper Szczecinski Motion to Strike **(Doc. 52)** be granted in part and denied in part as discussed above. We recommend that to the extent Plaintiff asserts a Fourth Amendment illegal search claim against Defendant Trooper Szczecinski, Defendant's Summary Judgment Motion **(Doc. 32)** be granted. We also recommend that Defendant Trooper Szczecinski's Summary Judgment Motion **(Doc. 32)** and Plaintiff's Summary Judgment Motion **(Doc. 40)** as against Defendant Trooper Szczecinski be denied with respect to Plaintiff's Fourth Amendment illegal seizure claim.[7]

**s/ Thomas M. Blewitt**
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: April 4, 2011**

7. As stated above, by separate Report and Recommendation we consider the cross summary judgment motions of Plaintiff and Defendant CT Corporation with respect to Plaintiff's negligence claim against this Defendant.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD PIAZZA,             :        CIVIL ACTION NO. **3:CV-09-1087**
                        :
    Plaintiff          :        (Judge Conner)
                        :
        v.          :        (Magistrate Judge Blewitt)
                        :
CT CORPORATION, t/d/b/a Mohegan  :
Sun at Pocono Downs and        :
PENNSYLVANIA STATE POLICE     :
DIVISION OF GAMING ENFORCEMENT, :
                        :
    Defendants       :

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **April 4, 2011.**

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter described in
> 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
> disposition of a prisoner case or a habeas corpus petition within fourteen (14)
> days after being served with a copy thereof.  Such party shall file
> with the clerk of court, and serve on the magistrate judge and all
> parties, written objections which shall specifically identify the
> portions of the proposed findings, recommendations or report to which
> objection is made and the basis for such objections.  The briefing
> requirements set forth in Local Rule 72.2 shall apply.  A judge shall
> make a *de novo* determination of those portions of the report or
> specified proposed findings or recommendations to which objection
> is made and may accept, reject, or modify, in whole or in part, the findings

46

or recommendations made by the magistrate judge.  The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the
magistrate judge, making his or her own determination on the basis
of that record.  The judge may also receive further evidence, recall
witnesses or recommit the matter to the magistrate judge with
instructions.


                                                          **s/ Thomas M. Blewitt**
                                                          **THOMAS M. BLEWITT**
                                                          **United States Magistrate Judge**

**Dated: April 4, 2011**